UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ABDULLAH ALKHALIDI, | ) |
| Plaintiff, | ) |
| vs. | ) Cause No. 1:11-cv-609-WTL-TAB |
| EDWIN BUSS, et al., | ) |
| Defendants. | ) |

## ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on the Defendants' motion for summary judgment (Dkt. No. 119). The motion is fully briefed, and the Court, being duly advised, **GRANTS** the motion, for the reasons set forth below. In light of this ruling, the Court **DENIES AS MOOT** the Plaintiff's motion for leave to file a cross-motion for summary judgment (Dkt. No. 142).

## I.  STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the Court accepts as true the admissible evidence presented by the non-moving party and draws all reasonable inferences in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required

to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II. BACKGROUND

The relevant facts of record, viewed in the light most favorable to the Plaintiff Abdullah Aklhalidi, the non-moving party, are as follow.[1]

In May 1999, Alkhalidi was arrested and charged with several crimes, including murder, and he was detained at the St. Joseph County Jail in South Bend, Indiana, pending his trial. In 2000, Alkhalidi was convicted of murder, robbery, and theft, and he was sentenced to sixty-five years in prison. Prior to his transfer to the Indiana Department of Correction ("IDOC"), St. Joseph County officials notified the IDOC as follows:

> For the first several months of his stay in this facility he was cooperative[,] and we experienced very little behavior out of this inmate.
>
> In January of this year[,] this inmate attacked one of our officers in what was believed to be a failed escape attempt . . . . Inmate Alkhalidi attacked the officer with the help of another inmate, however[,] this inmate was the one who broke the officer[']s jaw during the altercation.
>
> In February of this year, while assigned to our segregation block from the above incident, Alkhalidi attacked another inmate simply due to his unwillingness to share his two[-]man cell with another inmate.
>
> Use extreme caution when dealing with this inmate, he seems to be constantly sizing up the officers and watching for any weakness in security procedures. Inmate Alkhalidi has extensive martial arts training and quite obviously has no problem with hurting an officer, or another inmate for that matter.

Dkt. No. 121-1 at 12.

---

[1] The Court notes that Alkhalidi has not presented much in the way of facts through either his complaint or his response to the subject motion. His arguments are general, and he does not dispute the disciplinary charges alleged against him by the IDOC.

In December 2005, while at the Indiana State Prison ("ISP"),[2] Alkhalidi was recommended for "department-wide administrative segregation."[3] The following is noted in the request:

> [O]ffender Alkhalidi is currently housed on our administrative segregation unit. In December 2005[,] information was referred to staff of a possible escape attempt being compiled by the above offender. This escape attempt was to include hurting staff and taking a uniform and walking through the main entrance of the facility. With this information relayed[,] a shakedown was directed and resulted in the finding of several ounces of tobacco and marijuana along with other paraphernalia. . . .
>
> Through investigation[,] it was discovered this offender[']s involvement in drug/tobacco sales was and is extensive at the [ISP]. . . .
>
> With the current investigation and high security strains[,] we feel his placement in long-term segregation would be appropriate.

*Id.* at 35.

As of March 2006, the ISP had not received a decision from the IDOC's Central Office regarding Alkhalidi's designation, and on March 8, 2006, a second recommendation for department-wide administrative segregation was sent. On March 28, 2006, the Central Office approved the recommendation, and Alkhalidi was transferred to the SCU at the WVCF.

---

[2] It is not clear from the record where Alkhalidi was incarcerated and whether he was held in administrative segregation at any time between 2000 and 2005.

[3] According to the IDOC, "administrative segregation" is now referred to as "administrative restrictive status housing." The Court, however, will continue to refer to it as administrative segregation. If an inmate is assigned to administrative segregation, he is housed in the administrative segregation unit of that prison. However, those assigned to "department-wide administrative segregation" are housed in the Secured Control Unit ("SCU"), also referred to as the Secured Housing Unit ("SHU"), at the Wabash Valley Correctional Facility ("WVCF") or the Westville Control Unit ("WCU") at the Westville Correctional Facility ("WCF"). Both the SCU and the WCU are considered "supermax" sections of the prisons. "Supermax facilities are maximum-security prisons with highly restriction conditions, designed to segregate the most dangerous prisoners from the general prison population." *Wilkinson v. Austin*, 545 U.S. 209, 213 (2005).

On August 1, 2006, Alkhalidi appealed his designation. On September 1, 2006, the IDOC upheld the assignment and advised Alkhalidi that "for a number of reasons, [his] presence in general population constitutes a threat to the safety, security and orderly operation of the facility." *Id.* at 40. It also noted that Alkhalidi's designation would "be reviewed every thirty days by the Unit Management Team." *Id.*

In 2006, Alkhalidi's motion for post-conviction relief was granted, and a new trial was ordered. As a result, Alkhalidi was transferred from the IDOC to the St. Joseph County Jail, and he was held there pending his retrial. In April 2008, Alkhalidi was once again convicted of murder, robbery, and theft. This time, he was sentenced to fifty-five years in prison. Alkhalidi was transferred back to the IDOC in May 2008, and in July 2008, he was once again recommended for department-wide administrative segregation. The recommendation noted, in part, that during Alkhalidi's prior period of incarceration, he had been found guilty of possessing cigarettes, money, and drugs. *Id.* at 43. At that time, a psychiatrist also opined that Alkhalidi did not suffer from an AXIS 1 diagnosis or a serious mental illness. On August 5, 2008, the recommendation was approved, and he was transferred to the WCU at the WCF. Alkhalidi appealed his classification in March 2009, but staff determined that his housing assignment "continue[d] to be appropriate." *Id.* at 45.

On April 6, 2009, two cell phones were found in a package addressed to Alkhalidi. The package was marked "Legal Mail" and the phones were located in a hollowed-out book. During a subsequent search of Alkhalidi's cell, officers found a hollowed-out bar of soup hidden inside a soap wrapper. The hollowed-out portion of the soap was the same size as the cell phone. Alkhalidi was later found guilty of attempting to engage in trafficking.

In February 2010, Alkhalidi appealed his assignment to administrative segregation. The following month, prison staff notified him that the assignment "continue[d] to be appropriate." *Id.* at 52.

After one year at the WCU, in March 2010, Aklhalidi was transferred to the SCU at the WVCF so that he did not "become familiar with any facility['s] layout, schedule, etc." *Id.* at 53. A hearing was held at that time, and his placement was deemed appropriate. Alkhalidi appealed the assignment in April 2010. On April 16, 2010, he was notified that his appeal was denied, but he was instructed to contact his Unit Team staff member "to request a full [administrative segregation] review with the Unit Management Team." *Id.* at 55. Thereafter, classification hearings were held in April 2010 and May 2010, but his classification was affirmed on both occasions. Alkhalidi appealed his designation again in June 2010, August 2010, September 2010, and November 2010, but those appeals were also denied.

In January 2011, a detailed review of Alkhalidi's assignment was performed, and his case manager recommended that he remain in administrative segregation. The reviewer also noted that

> [a]lthough not confirmed, inmate Alkhalidi is a radical ritualistic individual. He has committed murder [and] he contends he fought in [the] Iraqi War. While incarcerated[,] he's trafficked [and] been in possession of drugs. . . . In August 2010, Alkhalidi admitted he had purchased a cell phone from another inmate for $1,000. He admitted receiving the cell phone, but not making full payment. He then ask[ed] for a facility transfer based on being in debt. This all occurred while Alkhalidi was in the SCU. Alkhalidi is not appropriate for general population.

*Id.* at 67.

Another detailed review was performed in June 2011. At that time, his case manager added that Alkhalidi's "crime [was] more severe than scored. . . . [H]is victim was found beheaded." *Id.* at 69.[4] His assignment was ultimately affirmed.

On November 22, 2011, Alkhalidi was found guilty of the unauthorized use or possession of an electronic device.

A detailed review and a hearing were conducted in January 2012. No changes were made to Alkhalidi's housing assignment, and his case manager noted as follows:

> When I try to conduct [business] with this offender, he finds any reason to argue. He does not want to respect and follow rules and regulations. He does not listen to instruction; rather, argues. He then gets mad if he doesn't get his way. Most times, if he had paid attention to instruction and followed the instruction, he would have gotten what he wanted. I believe this offender has the propensity to be dangerous.

*Id.* at 72. The case manager also noted that his "recent serious conduct" and his "unruly behaviors" favored keeping him in administrative segregation. Alkhalidi appealed his designation later that month, and on February 13, 2012, his appeal was denied.

On August 18, 2012, Alkhalidi assaulted three correctional officers while being escorted from the outside recreation pad to his cell. "He was found guilty by the Conduct Adjustment Board of three Class A-117 Assault on Staff" charges. *Id.* at 77.

On August 23, 2012, Alkhalidi threw feces at a correctional officer. He was found guilty of a Class A-102 Battery with Bodily Fluid charge by the Conduct Adjustment Board.

---

[4] An investigator hired by Alkhalidi's defense attorneys, however, states that the victim was shot; he was not beheaded. Alkhalidi's appellate record, which the Court takes judicial notice of, also indicates that the victim suffered a gunshot wound and was partially burned. While this added reason for keeping Alkhalidi in administrative segregation does not appear to have support in the record, the IDOC has identified a number of other reasons that Alkhalidi has remained in administrative segregation.

That same day, Alkhalidi attempted to head-butt a correctional officer. When officers secured him against a wall, he attempted to stomp on and kick at the officers. He was found guilty of a Class A-111/117 Assault of Staff charge by the Conduct Adjustment Board. Days later, he was recommended for department-wide disciplinary segregation (which is different than administrative segregation).[5] That designation was approved on September 21, 2012, and he was transferred back to the WCU.

On August 9, 2013, Alkhalidi requested placement in the Actions, Consequences and Treatment Program ("ACT") offered by the IDOC. "[A]n offender who signs up for and is assigned to ACT becomes an Administrative Segregation offender, with the running of disciplinary time stopped during successful participation in the Act." Dkt. No. 121-8 at ¶ 7. "If ACT is successfully completed, the disciplinary time is considered served." *Id.* at ¶ 8. "If the offender is removed from the ACT program, the disciplinary time is restarted at the point where it was stopped on assignment to the ACT Program, and the offender must complete the disciplinary time that was held in abeyance for the ACT Program." *Id.* at ¶ 9. As of October 2014, Alkhalidi had completed phases I through IV of the ACT Program. At that time, he was in the process of being transferred to the New Castle Correctional Facility ("NCCF") to complete Phase V. The IDOC's website indicates that Alkhalidi has since been transferred to the NCCF.

---

[5] "[A] person changed with misconduct may be confined or separated from the general population of [a] facility . . . for a reasonable period of time if his continued presence in the general population poses a serious threat to himself, others, property, or the security of the facility or program." I.C. § 11-11-5-6. According to Alkhalidi, however, those assigned to administrative segregation are housed in the same block as those assigned to disciplinary segregation.

7

## III.　DISCUSSION

Initially pro se, Alkhalidi attempted to file a class action lawsuit against a number of prison officials on March 28, 2011.[6] At that time, Alkhalidi was housed in the SCU at the WVCF. Alkhalidi alleged in his complaint that the Defendants were responsible for his placement in administrative segregation, and his "indefinite" assignment to administrative segregation is a violation of the Eighth Amendment and his due process rights.[7] Alkhalidi argues that the IDOC's process for assigning inmates to and keeping inmates under administrative segregation violates the constitution. In this regard,

> Alkhalidi alleges . . . that he was denied notice and an opportunity to respond to his classification to administrative segregation. . . . He . . . alleges that such placement was made intentionally in violation of his due process rights and that he suffered undue hardship as a result. . . . He also alleges that the defendants acted maliciously.

Alkhalidi's Resp. at 3. Alkhalidi further claims that he "has never been given a straight answer as to why he is on administrative segregation," *Id.* at 4, and "the reasons given [by the prison staff for his assignment to administrative segregation] were vague, non-responsive and/or non-specific." *Id.* at 5.[8] Had he been confronted with the various allegations against him, Alkhalidi argues that "he could have refuted them." *Id.* at 6.

---

[6] Alkhalidi's complaint appeared to be filed on behalf of himself and several other plaintiffs. For several reasons, the Court dismissed the claims asserted by anyone other than Alkhalidi, but allowed his individual claims to proceed. Dkt. No. 24.

[7] The Defendants argue in their reply brief that Alkhalidi did not allege any due process/adequate notice violations in his complaint. The Court, however, notes that pro se complaints are to be liberally construed, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed pro se is to be liberally construed, . . . and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.") (citations and quotation marks omitted), and finds that Alkhalidi sufficiently alleged a due process violation in his complaint. *See, e.g.*, Dkt. No. 1-1 at ¶ 28.

[8] Alkhalidi also argues that he is assigned to administrative segregation because he is from Iraq and prison staff believe him to be a terrorist or part of a "sleeper cell." Interestingly,

In response, the Defendants argue that "Alkhalidi's due process rights under the Fourteenth Amendment were not violated" because "Alkhalidi's placement in department-wide administrative segregation was reviewed every thirty days," and "[t]hat is all that is required under the Constitution after assignment." Defs.' Br. at 11-12. At the very least, the Defendants argue that they are entitled to qualified immunity.

### A. Statute of Limitations

As an initial matter, the Court will address the Defendants' argument concerning the statute of limitations. The Defendants argue that "this case is about [Alkhalidi's] assignment to administrative segregation [after] August 2008 (after retrial)"; it is not about Alkhalidi's initial assignment to administrative segregation in 2005/2006. Defs.' Br. at 18. They cite the two-year statute of limitations to support their argument. Alkhalidi argues, however, that under the continuing violations doctrine, any claims related to his original assignment to administrative segregation are fair game. He maintains that, upon his return to the IDOC, he was automatically placed on administrative segregation because of his prior classification. Thus, there was a continuing violation that extended the statute of limitations. The Court does not agree with Alkhalidi. When Alkhalidi returned to the custody of the IDOC in 2008, a *new* recommendation for department-wide administrative segregation was submitted to and approved by the Central Office. He was not referred to administrative segregation only because he was previously assigned administrative segregation. Although his new classification was based on events that occurred during his prior period of incarceration, it was a new classification and thus a new

---

Alkhalidi was noted as an "Iraqi terrorist" on what Alkhalidi purports to be a prison "Movement Sheet." *See* Dkt. No. 132-4. The authenticity of the document, however, is unclear and the reasons for Alkhalidi's placement in administrative segregation are documented throughout the IDOC records.

triggering event for purposes of the two-year statute of limitations. *See Brademas v. Indiana Hous. Fin. Auth.*, 354 F.3d 681, 685 (7th Cir. 2004) ("A § 1983 claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of his action.").

## B. Due Process Claim

Pursuant to Indiana Code Section 11-10-1-7(a), an offender may be involuntarily segregated from the general population if the IDOC finds that "segregation is necessary for the offender's own physical safety or the physical safety of others." The foregoing statute is restated in different terms in IDOC Policy # 02-01-111, entitled "The Use and Operation of Adult Offender Administrative Segregation," and Appendix XVI-C, entitled "Criteria/Procedure for Placement in Department-Wide Administrative Segregation." Those documents further provide as follows:

> [R]easons that may result in an offender's assignment to administrative segregation include, but are not limited to:
>
> 1. History of assaultive behavior;
>
> 2. Active member of a Security Threat Group who poses a threat to the safe and orderly operation of the facility;
>
> 3. A high escape risk;
>
> 4. The facility's need to contain, prevent or end a disturbance or other threat to the orderly operation of the facility;
>
> 5. Pending an investigation, disciplinary hearing or criminal trial;
>
> 6. Pending transfer to another facility;
>
> 7. A documented history of behavior that causes staff to believe that the offender's continued presence in the offender general population would be detrimental to the security of the facility or the offender; or
>
> 8. The offender is the subject of an on-going investigation and the segregation has been approved in accordance with the administrative procedures for Policy 02-04-101, "The Disciplinary Code for Adult Offenders."

Dkt. No. 121-3 at 4. The documents also provide that "[o]ffenders selected for a Department-wide administrative segregation unit must have exhibited extraordinary security concerns, such as seriously injuring staff or offenders, participating in a hostage situation, identified security threat group leader, heavily involved in trafficking or having a lengthy history of serious (Class A and/or B) conduct violations." Dkt. No. 121-5 at 1.

The Indiana statute concerning administrative segregation also provides that the IDOC "shall review an offender so segregated at least once every thirty (30) days to determine whether the reason for segregation still exists." I.C. § 11-10-1-7(b). Policy # 02-01-111 clarifies that the thirty-day review does not include a formal hearing. Offenders in department-wide administrative segregation, however, may request a "full review" every ninety days. If a request is made, a classification hearing is held.

In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court held that due process liberty interests prohibit restraints which impose an "atypical and significant hardship on an inmate in relation to the ordinary incidents of prison life." *Id.* at 484. Although prison inmates do not have a constitutional right to remain in general population, *see Lekas v. Briley*, 405 F.3d 602, 608-09 (7th Cir. 2005), in determining whether an atypical and significant hardship exists invoking due process, "both the duration *and* the conditions of the segregation must be considered." *Marion v. Columbia Correctional Inst.*, 559 F.3d 693, 698 (7th Cir. 2009). "[I]f the conditions of segregation were significantly harsher than those in the normal prison environment, then a year of [segregation] might count as a deprivation of liberty where a few days or even weeks might not." *Id.* (internal quotation omitted). The Seventh Circuit has ruled that "240 days in conditions materially more onerous than 'the ordinary incidents of prison life,' could deprive a

11

person of a 'liberty.'" *Marion v. Radtke*, 641 F.3d 874, 875 (7th Cir. 2011) (quoting *Sandin*, 515 U.S. at 484).

Given the nature of Alkhalidi's confinement, which he compares to solitary confinement, and the length of time Alkhalidi has been assigned to administrative segregation, the Court finds that a due process liberty was and is at stake. The Court thus must consider what process is required, and whether that process was provided to Alkhalidi.

### *1. Initial Assignment in 2008*

When an inmate is transferred to a supermax facility, he is "entitled to informal, nonadversarial due process." *Westefer*, 682 F.3d at 684. This "requires 'some notice' of the reasons for the inmate's placement . . . and enough time to 'prepare adequately' for the administrative review." *Id.* (citations omitted). The review may be conducted within a reasonable time after the transfer has occurred. *Id.* at 684. "Informal due process requires only that the inmate be given an 'opportunity to present his views,'" *Id.* at 685 (citations omitted); it does not require a hearing with the inmate present. *Id.* "If the prison chooses to hold hearings, inmates do not have a constitutional right to call witnesses or to require prison officials to interview witnesses." *Id.* (citations omitted). Due process also does not require "'a written decision describing the reasons' for an inmate's placement, . . . or mandate an appeal procedure." *Id.* at 686 (citations omitted). All that is required is "a review of the inmate's placement by 'the prison official charged with deciding whether to transfer [an inmate] to administrative segregation,' not a right to additional layers of review." *Id.* (citation omitted).

The Court finds that Alkhalidi was provided sufficient process in 2008, when he was assigned to department-wide administrative segregation. Before he was transferred to WCU, the reasons for his assignment were outlined in a formal recommendation to the Central Office. Dkt.

No. 121-1 at 43. At that time, he had a history of injuring staff (at the St. Joseph County Jail) and he had been found guilty of two Class A violations and one Class B violation. According to the IDOC, he was also involved in at least two escape attempts. Alkhalidi was also examined by a psychiatrist prior to his transfer. Even now, Alkhalidi does not dispute these allegations.

After the recommendation for department-wide administrative segregation was approved in August 2008, Alkhalidi was instructed that he could appeal his designation, and he did so in March 2009. He argued that he was "CCI/Job eligible,"[9] he was "clear of any conduct report since 12-21-2005," and he did "not meet any of the reasons/criteria or standards for admittance to administrative segregation." *Id.* at 45. His appeal was denied and his assignment was deemed "appropriate." In light of the foregoing case law, the Court finds that the process provided to Alkhalidi was adequate.[10]

## 2. Subsequent Reviews

The Supreme Court has held that "[p]rison officials must engage in some sort of periodic review of the confinement of [inmates in administrative segregation]." *Hewitt v. Helms*, 459 U.S.

---

[9] The Court does not know what "CCI" refers to.

[10] Alkhalidi cites the non-precedential case *Littler v. Indiana Dep't of Corr. Com'r*, No. 3:11-cv-218, 2013 WL 1149607 (N.D. Ind. 2013), in support of his argument. In *Littler*, an inmate argued that the IDOC denied him due process when they transferred him from the ISP to the WCU. Citing *Wilkinson*, the court noted that

> [w]hen considering whether to transfer a prisoner to a facility where conditions of confinement constitute an atypical and significant hardship[,] due process requires:
>
>> officials to provide a brief summary of the factual basis for the classification review and allowing the inmate a rebuttal opportunity safeguards against the inmate's being mistaken for another or singled out for insufficient reason.

*Id.* at *1. (quoting *Wilkinson*, 545 U.S. at 226). The record in *Littler* is not entirely clear, however, the court concluded that Littler was not provided adequate notice of, or an opportunity to respond to, the reasons for his transfer to the WCU. As noted above, that is not the case here.

13

460, 477 n. 9 (1983). "This review will not necessarily require that prison officials permit the submission of any additional evidence or statements." *Id.* When a due process liberty interest is at stake, an inmate is entitled to "some informal, non-adversarial" procedures. *Westefer v. Neal*, 682 F.3d 679, 684–85 (7th Cir. 2012). Informal due process under these circumstances requires a periodic review of the placement determination at a frequency sufficient to ensure that "administrative segregation does not become 'a pretext for indefinite confinement.'" *Id.* at 686. (quoting *Hewitt*, 459 U.S. at 477). The determination of the frequency of periodic review is committed to the discretion of prison officials. *Id.* (quoting *Toussaint v. McCarthy*, 926 F.2d 800, 803 (9th Cir. 1990) (holding that 120-days between reviews satisfied due process)). In sum, "the requirements of informal due process leave substantial discretion and flexibility in the hands of the prison administrators." *Westefer*, 682 F.3d at 685.

It is undisputed that during Alkhalidi's assignment to administrative segregation, prison officials have reviewed his assignment every thirty (30) days. *See* Dkt. No. 121-10 at 10. Alkhalidi argues, however, that this review has been perfunctory and the reasons behind his designation have not been adequately explained to him. However, he does not cite to any precedent which requires any additional process, review, or explanation.[11] Alkhalidi also has an opportunity for more formal hearings every ninety days, which appears to go beyond what is required by the Constitution and case law. He has exercised that right on several occasions. As noted above, prison officials must be accorded substantial discretion and flexibility in determining the security risks presented by offenders in administrative segregation. For these reasons, the defendants are entitled to summary judgment on Alkhalidi's due process claim.

---

[11] The Court notes that *Littler* deals with an initial transfer into administrative segregation, not subsequent reviews.

Because there has been no violation of Alkhalidi's due process rights, the Court need not reach the Defendants' additional argument that they are entitled to qualified immunity. *Mucha v. Village of Oak Brook,* 650 F.3d 1053, 1057-58 (7th Cir. 2011) (when there is no constitutional violation, defendants "do not require the additional protection of qualified immunity.").[12]

## IV. CONCLUSION

For the reasons set forth above, the Defendants' motion for summary judgment (Dkt. No. 119) is **GRANTED,** and the Plaintiff's motion for leave to file a summary judgment motion (Dkt. No. 142) is **DENIED AS MOOT**.

SO ORDERED: 3/19/15

*[signature: William T. Lawrence]*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.

---

[12] Alkhalidi argues that, while in administrative segregation, he is housed in a seven-foot by ten-foot windowless cell, made of solid concrete walls and a half-inch solid steel door. He is allowed one hour of recreation, and he may shower two to three times per week. He must eat and recreate by himself, and he is not allowed any contact with any other prisoner or person. It does not appear, however, that Alkhalidi alleged an Eighth Amendment claim related to these conditions of his confinement in his complaint. Further, the Defendants argued in their brief that any Eighth Amendment claim alleged by Alkhalidi is unsupported. *See* Defs.' Br. at 13-16. Alkhalidi did not respond to the Defendants' Eighth Amendment arguments. For these reasons, the Court has not analyzed or considered a "separate" Eighth Amendment claim related to Alkhalidi's allegations. *See United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) ("It is not the obligation of [the] court to research and construct the legal arguments open to parties, especially when they are represented by counsel," and "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (citations and quotation marks omitted).